UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


JESSICA KELL                                              CIVIL ACTION

VERSUS                                                    No. 17-1527

IBERVILLE BANK, ET AL.                                   SECTION: "J"(3)


## ORDER AND REASONS

Before the Court are a *Motion for Summary Judgment* **(Rec. Doc. 37)** and a
*Motion for Partial Summary Judgment* **(Rec. Doc. 50)** filed by Defendants, Iberville
Bank, through its successor The First, A National Banking Association, and The First
Bancshares, Inc. The Parties have briefed the former (Rec. Doc. 37) extensively; both
Parties have been given leave to file supplemental memoranda. The motion for partial
judgment (Rec. Doc. 50) is limited to causation of certain damages and is unopposed,
so it will be **GRANTED**. Having considered the Motion and legal memoranda, the
record, and the applicable law, the Court finds that Defendant's Motion for Summary
Judgment (Rec. Doc. 37) should be **GRANTED IN PART and DENIED IN PART**.


## FACTS AND PROCEDURAL BACKGROUND

This case involves the termination of a bank's regulatory compliance officer,
allegedly motivated in part by a desire to retaliate against the officer for
whistleblowing on a fraud committed by an employee at the bank. The bank, Iberville
Bank, is now defunct; its successor is The First, A National Banking Association.

From 1931 until 2017, Iberville bank was owned by A. Wilbert's Sons Lumber and Shingle Inc.[1] ("Lumber and Shingle"). (Rec. Doc. 44 at 1).

Beginning around 2008, Iberville Bank began experiencing safety and soundness issues. According to the CEO and chairman of Lumber and Shingle, Klein Kirby, the bank owners did not receive a dividend from 2009 to 2011. (Rec. Doc. 44 at 2). On May 20 of 2010—amid these problems—Iberville Bank hired Plaintiff Jessica Kell as the bank's Compliance Officer and Bank Secrecy Act ("BSA") Compliance Officer (Rec. Doc. 44 at 3). As BSA Compliance Officer, Plaintiff was responsible for the supervision and administration of the bank's compliance with anti-money laundering laws, including the BSA. Among other things, the BSA requires financial institutions to report suspicious activities that might signify criminal conduct. *See* 31 U.S.C. §§ 5311-5330. Federal regulations clarify that banks are required to submit a suspicious activity report ("SAR") to the Treasury's Financial Crimes Enforcement Network ("FinCEN") if the bank detects insider abuse involving any amount within 30 days of discovering the conduct. 12 C.F.R. § 353.3.

The record indicates, and Defendants do not dispute, that between 2010 and 2014 Plaintiff received excellent ratings in her performance evaluations. In February of 2014, Plaintiff was promoted to Vice President and she received her first bonus at the end of 2015 for her performance. (Rec. Doc. 44 at 4-5). Robert Smith, the President

---

[1] As its name suggests, A. Wilbert's Sons Lumber and Shingle Inc. was incorporated in the 19th century by cabinet maker Anton Wilbert. Approximately 180 of the German immigrant founder's descendants own Lumber and Shingle today. Klein Kirby is Anton's direct descendent. (Rec. Doc. 44 at 1-2)

and CEO of Iberville Bank, testified that "Jessica Kell is one of the brightest people I know" and noted that her job performance is "[a]lways good." (Rec. Doc. 44 at 5).

On September 15, 2015, Smith became aware of a loss in the insurance division of the bank—Iberville Insurance Agency, a wholly-owned subsidiary. (Rec. Doc. 44 at 5). The manager of the division, Robert Martin, was covering up that premiums on a policy insuring buses were uncollectible. The auditors who had discovered the loss found that receivables were being booked as negative payables. (Rec. Doc. 44 at 5). In total the bank lost $764,362.87. Plaintiff argues Martin was an insider of Iberville Bank. Thus, under the BSA, Iberville Bank was required to file an SAR within 30 days of discovering the loss. *See* 12 C.F.R. § 353.3(b).

However, Smith did not inform Plaintiff of the loss until October 19, 2015. (Rec. Doc. 44 at 6). Smith informed the Board of the loss the next day. Plaintiff testified that after the loss she found Smith to be less forthcoming with information and that she began to unexpectedly receive criticism from Smith regarding her performance, a first. (Rec. Doc. 44 at 6). She also testified in her deposition that Smith told her not to file a SAR with local law enforcement, despite a recommendation in the federal regulations that a bank do so in that circumstance. (Rec. Doc. 40-5 at 31-32). 12 C.F.R. § 353.3 ("A bank is encouraged to file a copy of the suspicious activity report with state and local law enforcement agencies where appropriate.").

On November 16, 2015, regulators began the FDIC Compliance and Community Reinvestment Act exam. The Safety and Soundness exam began on December 7, 2015. On January 20, 2016, Smith informed Plaintiff that she could no

longer work from home and reminded her that she was "an at-will employee, meaning that the Bank or [Plaintiff] may terminate the employment relationship at any time." (Rec. Doc. 40-3 at 56). A week later, the bank rehired Jeannie Guillory with the intention she become the new BSA Officer. (Rec. Doc. 44 at 5). On February 5, 2016, regulators informed in bank in its exit interview for the Safety and Sound exam that the bank was not completing its obligations under the BSA in a satisfactory manner. (Rec. Doc. 44 at 8). A reason for this was that SARs were not being filed timely, which contributed to the evaluator's conclusion that "[t]he BSA Office is unable to devote sufficient time to BSA-related duties because of other significant duties at the bank." (Rec. Doc. 40-5 at 64).

On February 22, 2016, the bank placed Plaintiff on a 90-day probation, purportedly because of the bank's poor performance on the compliance and safety and soundness exams. (Rec. Doc. 44 at 9). That same day, Plaintiff called the FDIC ombudsman by dialing an 800 number. (Rec. Doc. 40-5 at 241-242). Plaintiff recalls that during her 26-minute phone call, she summarized the events described above and said that she believed the bank was attempting a cover-up of some type. (Rec. Doc. 44 at 9). On March 2, after a phone call with a special agent at the FDIC, Plaintiff e-mailed to that agent over 400 pages of documents concerning the loss in the insurance division. (Rec. Doc. 40-5 at 51). Plaintiff had stored these documents on the cloud.

On March 11, 2016, the bank's IT manager, Robin Pitre, discovered that Plaintiff had stored these documents on the cloud. (Rec. Doc. 44 at 10). Plaintiff knew

that Pitre would have to report this as a security violation but asked whether Pitre would have to report the names of the files. (Rec. Doc. 40-5 at 24). The names on the files stored in the cloud revealed that they related to the insurance loss. Pitre took screen shots of the names of the documents. When Pitre met with Charlette Williams, Plaintiff's supervisor and Smith the following week, Pitre did not bring screenshots of the file names with her to the meeting. However, she was under the impression Smith was familiar with the screen shots. (Rec. Doc. 40-8 at 5).

Plaintiff discovered that Smith and Williams also had been granted access to her Outlook account. It is unclear whether this access extended beyond the calendar to Plaintiff's e-mail from which Plaintiff had sent the documents to the FDIC. (Rec. Doc. 45-2 at 4-5).

On March 14, 2016, Smith called Plaintiff to inform her that she was being put on paid leave of absence, so the Bank could investigate her storing the documents on the cloud. During this conversation, Smith allegedly said that he "had never known the FDIC to circumvent senior management." (Rec. Doc. 44 at 10-11). Smith terminated Plaintiff's employment on March 17, 2016, "because [Plaintiff] breached the Bank's IT policy while on probation as a result of the FDIC's and OFI's criticism of her performance as the bank's BSA officer." (Rec. Doc. 37-1 at 7).

Plaintiff filed suit on February 22, 2017. In her amended complaint, Plaintiff alleges that Iberville Bank illegally retaliated against her for providing information to the FDIC in violation of 12 U.S.C. § 1831j(a) and 31 U.S.C. § 5328. Plaintiff also claimed Defendant was liable under Louisiana Civil Code article 2315 for outrageous

and harassing conduct that caused her undue humiliation, embarrassment, and anxiety. (Rec. Doc. 12). Defendant then filed its Motion for Summary Judgment.

## PARTIES' ARGUMENTS

Defendant argues that Plaintiff's whistleblower claim is subject to summary judgment because Plaintiff cannot prove that Smith knew of her decision to contact the FDIC regarding the alleged coverup. Defendant alleges that Plaintiff simply has no proof that Smith knew she had contacted the FDIC when the bank terminated her. Second, Defendant argues that only one whistleblower statue can apply, and because 12 U.S.C. § 1831j does apply, 31 U.S.C. § 5328 does not. Finally, Defendant argues that ordinary employment disputes do not give rise to a claim for infliction of emotional distress claim, and that Plaintiff cannot prove a pattern of repeated harassment. (Rec. Doc. 37-1 at 2-3).

Plaintiff argues that the record indicates that there are questions of fact as to whether Smith knew of Plaintiff's protected activity at the time of termination. Plaintiff argues that she was placed on leave so that the Bank could investigate her placing the insurance loss documents on the cloud. Furthermore, Plaintiff argues that Smith's comment that he "had never known the FDIC to circumvent senior management" at the March 14, 2016 meeting gives rise to the inference that Smith knew why Plaintiff had placed these documents on the cloud. Plaintiff also points to Smith's alleged access to her e-mail as another way Smith knew she was communicating with the FDIC. Plaintiff also points to the temporal proximity of her

firing and the protected activity as circumstantial evidence of the bank's motivations for terminating her. Finally, Plaintiff argues that Defendant has failed to demonstrate with clear and convincing evidence that Defendant had a legitimate, non-retaliatory reason for firing her. (Rec. Doc. 14-16), Plaintiff also alleges that there are questions of fact as to whether Defendant violated a state whistleblower statute. Finally, Plaintiff argues that the circumstances of this employment dispute are sufficient to support an infliction of emotional distress claim, because Smith knew she was pregnant and that the day after she was put on probation, she miscarried.[2]

In its reply, Defendant argues that the file names do not prove that Smith knew that the files were being provided to a third party and points out that the evidence provided indicates that Smith at most had access to Plaintiff's Outlook calendar, not her e-mails.

Finally, in supplemental briefing (Rec. Doc. 60), Plaintiff cites to deposition testimony of Jeannie Guillory—who was re-hired by Iberville Bank to be BSA compliance officer—indicating that Plaintiff had told her before Plaintiff was terminated that she was going to complain to the FDIC. Defendant argues that this evidence does not give rise to a permissible inference that Smith—the ultimate decision maker—knew that Plaintiff had actually gone forward with the complaint. (Rec. Doc. 66).

---

[2] Defendant's Motion for Partial Summary Judgment (Rec. Doc. 50) seeks summary judgment on the issue of causation of the miscarriage. In her response, (Rec. Doc. 57), Plaintiff indicates that she does not intend to argue that Iberville Bank caused her miscarriage, but she reserves the right to offer evidence of miscarriage to demonstrate the egregiousness of Iberville Bank's conduct.

## STANDARD OF LAW

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)), *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g.*, *id.* at 325; *Little*, 37 F.3d at 1075.

## **DISCUSSION**

### I.   PLAINTIFF'S § 1831J CLAIMS

The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") forbids banks from terminating or discriminating against employees for providing information to federal agencies regarding the violation of law by the bank or its employees. 12 U.S.C. § 1831j. The whistleblower provision provides its own cause of action to the employee who is discriminated against. 12 U.S.C. § 1831j(b). The burden of proof for such a claim is provided by cross-reference to the Whistleblower Protection Act ("WPA"), 5 U.S.C. § 1221, which states:

> The employee may demonstrate that the disclosure or protected activity was a contributing factor in the personnel action through circumstantial evidence, such as evidence that—
>
> > **(A)** the official taking the personnel action knew of the disclosure or protected activity; and

**(B)** the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action.

The WPA also provides the defending entity with an opportunity to rebut; remedy is not allowed "if, after a finding that a protected disclosure was a contributing factor, the [bank] demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." 5 U.S.C. § 1221(2). Thus, to succeed the plaintiff must prove that she made a protected disclosure and that the disclosure was a "contributing factor" to the decision to terminate or discriminate against her. *Primes v. Par. Nat. Bank*, No. CIV. A. 93-3737, 1995 WL 241853, at *5 (E.D. La. Apr. 24, 1995). "A contributing factor means any factor which alone, or in connection with other factors, tends to effect, in any way, the outcome of the decision." *Id.* If the plaintiff succeeds in establishing a prima facie case the burden shifts to the defendant to demonstrate by clear and convincing evidence that the defendant would have acted in the same way even if it had not known of any protected disclosure. *Id.*

Here, it appears that the Parties agree that an employee of the bank possibly violated the law and Plaintiff made her first protected disclosure regarding this conduct on February 22, 2016, in her phone call to the FDIC.[3] Nevertheless,

---

[3] Plaintiff does not appear to argue that the filing of internal reports, such as SARs, constituted protected disclosures. *See Hill v. Mr. Money Fin. Co.*, 491 F. Supp. 2d 725, 735–36 (N.D. Ohio 2007) (rejecting the plaintiff's position that internal reports could constitute protected disclosure under 1831j or 5328(a)). Nor does Plaintiff suggest that Defendant can be liable under 12 U.S.C. § 1831j for employment decisions made prior to the February 22 phone call, such as the bank's decision to place Plaintiff on 90-day probation. *See id.* at 733 (finding that federal whistleblower statutes clearly only apply to employment decisions made after a protected disclosure).

Defendant argues that Plaintiff cannot make a prima facie case that this disclosure contributed to the bank's decision to discharge her because the decision-maker, Smith, did not know of any of Plaintiff's protected disclosures.[4] Defendant argues that the conjunctive "and" in the above quoted section of 5 U.S.C. § 1221 requires that Plaintiff show temporal proximity between the employment decision and the disclosure *and* present independent evidence that the decisionmaker knew of the disclosures. *See Rouse v. Farmers State Bank of Jewell, Iowa*, 866 F. Supp. 1191, 1209 (N.D. Iowa 1994) ("[T]he plaintiff under this whistle-blower statute must establish both temporal proximity *and* actual or constructive knowledge of the defendant of the disclosures at the time of the employment decision to meet the 'contributory factor' test."). Although, the preceding phrase, "such as," lends doubt to Defendant's preferred interpretation, the Court assumes arguendo that Plaintiff cannot rely only on temporal proximity evidence alone to prevail.[5]

---

[4] In addition to the February 22 phone call, Plaintiff also had telephone conversations with someone at the FDIC Ombudsman's office on February 27, 2016 and with a special agent at the FDIC on March 1, 2016. Plaintiff then e-mailed documents to the same special agent on March 2, 2016. (Rec. Doc. 37-1 at 8). Each of these communications constitutes a protected disclosure.

[5] Of course, it is indisputable that "[i]f an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999). The issue is by what circumstantial evidence a plaintiff must prove the decision maker's knowledge. In finding that temporal evidence alone could not support a prima facie case, the *Rouse* court relied upon *Wagner v. E.P.A.*, 51 M.S.P.R. 337 (M.S.P.B. Nov. 21, 1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992). However, in *Wagner* the Merit Systems Protection Board noted that the "timing of the appellant's evaluation was in virtually no way within the control of agency officials . . . [t]herefore under the circumstances of this appeal, it does not follow that a 'reasonable person could conclude from proximity in time that the disclosure was a factor in the personnel action.'" *Id.* at 346. (citation omitted). In fact, the Board, which reviews WPA claims often, has held that "the knowledge/timing test is not the only way for an appellant to satisfy the contributing factor standard; rather, it is only one of many possible ways to satisfy the standard." *Dorney v. Dep't of Army*, 117 M.S.P.R. 480, 486 (M.S.P.B. Mar. 6, 2012). Given the case law cited, the Court declines to hold that temporal evidence alone could *never* be sufficient evidence that a protected disclosure was a contributing factor in an employment decision.

Even so, Plaintiff has made her prima facie case because the temporal proximity *and* other evidence submitted, considered together, give rise to the reasonable inference that Smith knew of Plaintiff's disclosures and that this knowledge contributed to his decision to terminate Plaintiff. First, it is undisputed that Defendant regarded Plaintiff as an excellent employee before late 2015; around the same time that Defendant became aware of the loss in the insurance division— the subject of Plaintiff's protected disclosures. From the time she started till 2014, Plaintiff never received a performance evaluation of less than 8.55 out of 9 available points. (Rec. Doc. 44 at 4-5). Already, this distinguishes this matter from one of the two district court opinions Defendant relies upon. *See Cosgrove v. Fed. Home Loan Bank of New York,* No. 90 CIV. 6455 (RPP), 1999 WL 163218, at *9 (S.D.N.Y. Mar. 23, 1999) ("Plaintiff's claim that she was an 'exemplary' employee throughout her employment at FHLBNY is belied by the evidence submitted by both parties").

Second, Defendant does not contest that Plaintiff's disclosures are close in time to Defendant's adverse employment decisions. Plaintiff sent the documents relating to the insurance loss on March 2, 2016. The bank learned that Plaintiff had placed these same documents on the Cloud on March 11. Three days later, Defendant placed Plaintiff on leave and three days after that, on March 17, the bank terminated Plaintiff. The Fifth Circuit has found that two full years elapsing between protected conduct and retaliatory discharge renders a "theory of retaliation quite doubtful" but is not dispositive. *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 169 (5th Cir. 1999) (considering alleged unlawful retaliation under 42 U.S.C. § 2000e-3)).

In contrast, the close temporal proximity in this case—a matter of weeks—is evidence that Plaintiff's disclosures were a contributing factor in Defendant's personnel decisions.

Third, Plaintiff has submitted other circumstantial evidence that Defendant knew of Plaintiff's disclosures. Defendant's proffered reason for firing Plaintiff is that Plaintiff, while on probation, violated the bank's IT policy by placing documents on the cloud. Storing these documents on an outside, unauthorized server was a security violation, which Plaintiff admits. (Rec. Doc. 37-1). However, Defendant makes no attempt to address the fact that these were the same documents that *Plaintiff sent to the FDIC in her whistleblowing e-mail*. The names of the documents—visible in screen shots taken by the bank's IT staff member on March 11—clearly convey that they pertain to the insurance loss. (Rec. Doc. 45-2 at 3). Defendant suggests that Smith's knowledge that Plaintiff had stored these documents outside of Defendant's servers is not proof that Smith knew that Plaintiff had sent this information to the FDIC. The Court agrees that it is not *conclusive proof*, but the fact that the bank's compliance officer had made a move to preserve evidence of wrongdoing at the bank would certainly suggest that Plaintiff was disclosing this same information to the appropriate federal agencies.

Plaintiff also provides copies of notes she took regarding the March 14, 2016 meeting, when Smith put her on leave of absence to investigate her storing documents on the cloud. (Rec. Doc. 40-5 at 59). The note indicates that Plaintiff recalls Smith stating that "he's never known the FDIC to circumvent senior management for

investigation." (Rec. Doc. 40-5 at 59). Again, while inconclusive in and of itself, it is circumstantial evidence that Smith knew Plaintiff was cooperating with the FDIC when he decided to put her on leave.

Defendant insists that what is offered above is not enough to withstand summary judgment. Defendant relies on two district court opinions which found that plaintiffs had failed to establish that the defendants knew of protected disclosures. Both are easily distinguishable. In *Rouse v. Farmers State Bank of Jewell, Iowa*, the court found that the plaintiff had demonstrated temporal proximity but had failed to demonstrate that the defendant had any knowledge of the protected disclosures. 866 F. Supp. 1191, 1209 (N.D. Iowa 1994). Quite clearly, the reason Defendant failed this burden was because he could not show that *anyone* other than himself or the FDIC knew of his disclosures. *Id.* at 1209. Because the plaintiff in that case had not told anyone else he was disclosing to the FDIC, the court determined it could only find that the disclosures contributed to the defendant's personnel action if the FDIC had breached its promises of confidentiality. There was simply no evidence that it had. *Id.*

Similarly, the other case Defendant relies upon, *Cosgrove v. Fed. Home Loan Bank of New York*, does not resemble the facts of this case. No. 90 CIV. 6455 (RPP), 1999 WL 163218, at *11 (S.D.N.Y. Mar. 23, 1999). There, the court began by finding that the plaintiff had been at most a "satisfactory" employee and then found the protected disclosures and termination—separated by 16 months—were not temporally proximate. *Id.* at 8-10. The court ended its opinion by finding that the

14

Defendant had proved by clear and convincing evidence that the plaintiff had been fired for her lack of interpersonal skills and for the poor quality of her work, as demonstrated by many internal reviews. *Id.* at 13 (quoting from an evaluation complaining that "plaintiff did not present information in a logical manner and basic information often was missing in work papers."). In between these findings the court noted that the plaintiff had failed to provide "any evidence from which it can be inferred that those responsible for her termination were aware of any whistleblowing activities by plaintiff during this period." *Id.* at 11.

Here, applying the *Rouse* court's disjunctive analysis, the court finds that at the summary judgment stage the court must make the reasonable inference that Smith knew that Plaintiff had made protected disclosures and that this factored in the decision to terminate Plaintiff. Unlike in *Rouse*, it is undisputed that Plaintiff informed a co-worker of the Defendant that she intended to make a protected disclosure. (Rec. Doc. 66). Moreover, it is Defendant's position that Smith fired Plaintiff for storing the documents she had delivered to the FDIC on the Cloud. Smith did so only after an "investigation" into Plaintiff's conduct. The Court must infer then that Smith knew what documents Plaintiff was storing off-site and must also infer that Smith understood this act by Plaintiff to mean that Plaintiff was acting as a whistleblower.

Having found that Plaintiff has staked out a prima facie case, the Court must determine whether Defendant has proved by clear and convincing evidence that it still would have terminated Plaintiff regardless of Plaintiff's disclosures. The Court

finds that the Defendant falls short of satisfying this tall burden. As the Court has already explained above, this case does not resemble *Cosgrove*. There, Defendant demonstrated with extensive citation to performance evaluations and affidavits that the Plaintiff put in below satisfactory work and clashed with co-workers for a period of about 16 months. *Cosgrove*, 1999 WL 163218, at *10. Similarly, in *Mann v. Fifth Third Bank*, the court was convinced that the defendant had indeed fired the plaintiff for what were clearly inappropriate e-mails. No. 1:09-CV-014, 2011 WL 1575537, at *6 (S.D. Ohio Apr. 25, 2011).

Here, Defendant alleges it put Plaintiff on probation because of criticism of the bank's BSA program, and that it terminated her for violating the bank's IT policy. (Rec. Doc. 37-1 at 14-15). However, Plaintiff asserts that the bank's BSA program was criticized because she was prevented from doing her job due to the bank's resistance to providing her relevant information in a timely fashion. (Rec. Doc. 44 at 7). She also alleges that she was terminated because of the content of the information she saved onto the cloud, not for the act itself. (Rec. Doc. 44 at 16). Unlike in the cited cases where the employers had persuasive reasons for firing that were independent of any whistleblower activity, here it is unclear who is at fault for the bank's poor performance on the BSA examination. That is something the trier of fact will need to decide. Considering Plaintiff's record of exemplary performance, the temporal proximity, and the other circumstantial evidence provided by Plaintiff, the Court is not convinced that Plaintiff was terminated for the reasons that Defendant provides. Summary judgment is inappropriate.

## II. PLAINTIFF'S LOUISIANA WHISTLEBLOWER CLAIM

In its opposition, Plaintiff asserts that Defendant personnel decisions violated the Louisiana Whistleblower Statute, La. R.S. 23:967. Defendant argues this Court should not consider a claim not raised in the complaint. However, the Fifth Circuit has held: "Under our precedent, when a claim is raised for the first time in response to a summary judgment motion, the district court should construe that claim as a motion to amend the complaint under Federal Rule of Civil Procedure 15(a)." *Riley v. Sch. Bd. Union Par.*, 379 F. App'x 335, 341 (5th Cir. 2010). Rule 15(a) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15. Leave is by no means automatic. *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 666 (5th Cir. 1981) ([T]he decision to grant or to deny . . . leave to amend lies within the sound discretion of the trial court.") "In deciding whether to grant leave to file an amended pleading, the district court may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).

Plaintiff, who is represented by counsel, was given leave to amend her complaint in June of 2017. Plaintiff filed her opposition, raising this new state law claim over a year later. Courts have found that allowing amendment would unduly

prejudice defendants where it would be necessary to reopen discovery, reexamine witnesses, and cause defendants to undergo additional litigation costs. *See, e.g.*, *Riley v. Union Par. Sch. Bd.*, No. CIV.A. 09-0319, 2010 WL 3245136, at *4 (W.D. La. Aug. 16, 2010). At first glance, one might assume that Louisiana's whistleblower statute is sufficiently similar to its federal counterpart that amendment would not require additional discovery or otherwise disrupt these proceedings. Section 967 prohibits an employer from retaliating "against an employee who in good faith, and after advising the employer of the violation of law: . . . [d]iscloses or threatens to disclose a workplace act or practice that is in violation of state law."

However, Louisiana courts have interpreted Louisiana's whistleblower statute to place rather sever limitations on who can bring a claim. Besides for the obvious addition of a notice requirement, Louisiana courts have also held that the state law action is only available to plaintiffs who know of an actual violation of state law. *Hale v. Touro Infirmary*, 886 So. 2d 1210, 1215 (La. App. 4 Cir. 11/3/04) ("[T]he Whistleblower Statute only offers protection to a specific class of employees: those employees who face "reprisals" from their employers based solely upon an employee's knowledge of an illegal workplace practice and his refusal to participate in the practice or intention to report it."). Thus,

> [I]n order to prevail, [Plaintiff] must establish that (1) [Defendant] violated the law through a prohibited workplace act or practice; (2) she advised [Defendant] of the violation; (3) she threatened to disclose [or disclosed] the practice; and (4) she was fired as a result of her refusal to participate in the unlawful practice or threat to disclose the practice.

*Hale*, 886 So. 2d at 1216. In contrast, 12 U.S.C. §1831j protects an employee who discloses "a possible violation of any law." Thus, allowing Plaintiff to add a state law whistleblower claim would expand the scope of the litigation to include the determination of whether the conduct of a third party, the manager of the bank's insurance division—constituted bank fraud or theft.[6] The Court declines Plaintiff's implicit request to expand the scope of this litigation at this late hour.

## III.   PLAINTIFF'S REDUNDANT FEDERAL WHISTLEBLOWER CLAIM

Defendant points out that 31 U.S.C. § 5328 states that it "shall not apply with respect to any financial institution or nonfinancial trade or business which is subject to section 33 of the Federal Deposit Insurance Act." This carve out applies in cases like this one, where this whistleblower statute would be redundant with 12 U.S.C. § 1831j. Accordingly, summary judgment is appropriate as to this claim.

## IV.   PLAINTIFF'S INFLICTION OF EMOTIONAL DISTRESS CLAIM

Plaintiff brings both intentional and negligent infliction of emotional distress claims. The Louisiana Supreme Court has affirmed that Civil Code article 2315 is sufficiently flexible to allow for an intentional inflectional of emotional distress claim, as that cause of action appears in the common law. *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991) ("One who by extreme and outrageous conduct is intentionally causes severe emotional distress to another is subject to liability for such emotional

---

[6] From the record it appears that the individual responsible for the insurance loss was never convicted of anything, although he did apparently pay restitution.

distress, and if bodily harm to the other results from it, for such bodily harm.") To succeed on an intentional claim, Plaintiff must prove: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict sever emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *Id.* For an employer's actions to qualify as "extreme and outrageous" they must be truly extraordinary. *See Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1027 (La. 2000) (collecting cases). Moreover, Louisiana "jurisprudence has limited the cause of action to cases which involve a pattern of deliberate, repeated harassment over a period of time." *Id.* at 1026.

Due to this limitation, plaintiffs bringing workplace emotional distress claims have tended to succeed only in exceptional cases, such as where a plaintiff has demonstrated a long pattern of severe abuse that has culminated in a threat to the employee's personal safety. *See, e.g., Bustamento v. Tucker*, 607 So. 2d 532 (La. 1992) (finding extreme and outrageous conduct where an employee was subjected to constant improper sexual comments and advances, was threatened with physical violence, and was almost run over by a forklift), *Walters v. Rubicon, Inc.*, 706 So. 2d 503 (La. App. 1 Cir. 1997) (finding extreme and outrageous conduct where supervisors constantly verbally abused plaintiff, ordered plaintiff to ignore company policy in possible violation of law, harassed plaintiff with phone calls, endangered plaintiff and plaintiff's son in traffic, and gestured that plaintiff would be shot).

Obviously, this case does not resemble those. The only act that Plaintiff alleges caused her emotional distress is her termination—distressing because it was made without justification. Normally, a personnel decision, even if it is wrong, does not give rise to an intentional infliction of emotional distress claim. *See Nicholas*, 765 So, 2d at 1027 (citing *Smith v, Ouchita Par. Sch. Bd.*, 702 So. 2d 727, 738 (La. App. 2 Cir. 1997)). However, Plaintiff argues that her termination was extreme and outrageous due to her particular vulnerability. She alleges in her opposition that she suffered a miscarriage around the time she was fired. She further alleges that Smith knew this because she informed Smith of a surgery she was required to undergo in the wake of the miscarriage. (Rec. Doc. 44 at 20). The procedure required general anesthesia and Plaintiff told Smith about it because she needed to take two days off work undergo it.[7]

Indeed, Louisiana courts have recognized that, "Where the actor has knowledge of another's particular susceptibility to emotional distress, the actor's conduct should not be judged in light of the effect such conduct would have on a person of ordinary sensibilities." *Wright v. Otis Eng'g Corp.* 643 So. 2d 484, 487 (La. App. 3 Cir. 1994). The Louisiana Third Circuit applied this rule in *Wright v. Otis Engineering Corp.*, a case where an employer allegedly berated his employee with profanity-laden tirades daily, and threatened her job often, for a period of five years. *Id.* The Court found that the trier of fact was required to consider the plaintiff's claims

---

[7] Plaintiff is rather equivocal about what she alleges Smith knew. She states she "believes she told Smith about a visit with her OB/GYN." (Rec. Doc. 44 at 19-20). It is unclear whether Plaintiff alleges she informed Smith of the nature of the procedure when she asked for leave, but for purposes of this Order, the Court assumes that Smith was fully informed.

while keeping in mind the plaintiff's allegation that the defendant had full knowledge of the plaintiff's "deteriorating mental condition, his hospitalization, and his shock treatment for depression." *Id.* However, while the court implied that the plaintiff's susceptibility to emotional distress lessened the necessary severity of the conduct for plaintiff to make a claim, the court did not find the plaintiff did not need to demonstrate a pattern of outrageous conduct. *Id.*

Here, the facts alleged do not permit an inference of a pattern of abuse—which Louisiana courts require a plaintiff to prove in a workplace intentional infliction of emotional distress claim. *Almerico v. Dale*, 927 So. 2d 586, 592 (La. App. 5 Cir. 2006). The Court accepts that Plaintiff was particularly susceptible to emotional distress because of her miscarriage. But while that finding lowers the bar for what conduct may qualify as extreme, it does not eliminate Plaintiff's burden to establish a pattern of "deliberate, repeated harassment over a period of time." *Id.* Plaintiff does not allege that Smith *ever* acted in an abusive manner towards her.[8] Nor does Plaintiff cite any case law suggesting that a termination which may violate whistleblower protections, is conduct that is "beyond all possible bounds of decency" and "atrocious and utterly intolerable in a civilized community." *Id.* Based on the record and the jurisprudence provided, the Court finds that the Plaintiff as failed to establish the first element.

---

[8] It bears mention that the Louisiana Supreme Court has found behavior that is well beyond the bounds of normal professionalism not to rise to the level of "extreme." *See White*, 585 So. 2d at 1207 (finding supervisor's conduct not extreme and outrageous where supervisor unjustly attacked plaintiff in a profane tirade that was sufficiently intense to give the plaintiff a panic attack that required the plaintiff to be hospitalized for two days).

Moreover, Plaintiff fails to support her conclusory allegation that she actually suffered "severe emotional distress." (Rec. Doc. 44 at 20); *cf. Pate v. Pontchartrain Partners, LLC*, No. CIV.A. 13-6366, 2014 WL 5810521, at *4 (E.D. La. Nov. 7, 2014) (finding dismissal of intentional infliction of emotional distress claim appropriate because even assuming that terminating employee in the late stage of pregnancy could qualify as extreme and outrageous, plaintiff produced no evidence to support second prong). Plaintiff explicitly references her miscarriage only to demonstrate the outrageousness of Defendant's conduct; she does not allege that Defendant's conduct caused her miscarriage. (Rec. Doc. 57). It is not enough that Plaintiff was potentially more vulnerable than an ordinary plaintiff; to satisfy the second element she must also point to the evidence in the record that demonstrates she suffered severe distress due to Defendant's actions. This she has not done. The potions of the deposition testimony cited by Defendant demonstrate that Plaintiff was "very emotional" upon being terminated (Rec. Doc. 51-6), but nothing in her testimony suggest the sort of mental anguish that an intentional infliction of emotions distress claim is intended to recover for. *See Gressett v. Southwest Airlines Company*, 216 F. Supp. 3d 743, 749 (E.D. La. 2017) ("Geniune humiliation, anxiety, confusion, upset, worry and the like are typically insufficient."), *Guilbeaux v. Times of Acadiana, Inc.* 693 So. 2d 1183, 1187 (La. App. 3 Cir. 1997) (finding "some amount" of humiliation and embarrassment insufficient for intentional infliction of emotional distress claim).

Plaintiff's negligent infliction of emotional distress claim similarly fails. "Under the general rule followed by the great majority of jurisdictions, if the

defendant's conduct is merely negligent and causes only mental disturbance, without accompanying physical injury, illness or other physical consequences, the defendant is not liable for such emotional disturbance." *Moresi v. State Through Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1095 (La. 19990). Plaintiff notes that the Louisiana Supreme Court, in *Moresi v. State Through Department of Wildlife & Fisheries*, recognized an exception for categories of cases that share an "especial likelihood of genuine and serious mental distress arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Id.* Plaintiff again argues that her miscarriage—close in time to her alleged wrongful termination—places her NIED claim within the exception recognized for special circumstances. However, Louisiana courts applying the special circumstances exception recognized in *Moresi* have found that recovery for an NIED claim is limited to those cases where the defendant's conduct was extreme and outrageous. *Covington v. Howard*, 146 So. 3d 933, 938 (La. App. 2 Cir. 2014). The Court has already found that Defendant's conduct did not rise to the level of extreme or outrageous workplace behavior.

In any case, Plaintiff has not demonstrated she suffered "genuine and serious mental distress." *Bonnette v. Conoco, Ind.* 837 So. 2d 1219, 1236 (La. 2003). "Although failure to seek medical treatment for the emotional distress sustained does not by itself doom a claim for emotional distress damages, it hampers any argument that a plaintiff was beset by severe anguish." *Gressett*, 216 F. Supp. 3d at 749. Even where plaintiffs provide testimony from a psychiatrist demonstrating depression or anxiety, that evidence may be insufficient to establish mental distress severe enough to

warrant application of the special circumstances exception. *See Bonnette*, 837 So. 2d at 1236. Here, Plaintiff does not only fail to indicate in her opposition that she ever saw a doctor or therapist for her alleged emotional anguish, she provides no supporting evidence whatsoever. Summary judgment is appropriate as to Plaintiff's intentional and negligent infliction of emotional distress claims.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's *Motion for Summary Judgment* (Rec. Doc. 37) is **GRANTED IN PART** as to Plaintiff's 31 U.S.C. § 5328, intentional infliction of emotional distress, and negligent infliction of emotional distress claims; and **DENIED IN PART** as to Plaintiff's 12 U.S.C. § 1831j claim.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Rec. Doc. 37), as construed as a motion for leave to amend complaint, is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's unopposed *Motion for Partial Summary Judgment* **(Rec. Doc. 50)** is **GRANTED**.

New Orleans, Louisiana, this 7th day of November, 2018.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE